UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

FILED
___ o'clock & ___ m
MAY 07 2004
BRENDA K. ARGOE, Clerk
United States Bankruptcy Court
Columbia, South Carolina

ENTERED
MAY 0 7 2004
J.G.S.

| IN RE: | C/A No. 03-10696-W |
|---|---|
| Lana M. Barthelmes, | Adv. Pro. No. 04-80007 |
| Debtor. | |
| Automotive Finance Corp., Plaintiff, | **ORDER** |
| v. | Chapter 7 |
| Lana M. Barthelmes, Defendant. | |

This matter comes before the Court upon Automotive Finance Corp.'s ("AFC") complaint (the "Complaint") against Lana Barthelmes' ("Debtor") seeking a determination of nondischargeability of a portion of the indebtedness owed it by Debtor due to the sale out-of-trust of certain automobiles. Debtor and Plaintiff have agreed at the pretrial conference and/or by their Joint Pretrial Order that the indebtedness owed Plaintiff on those certain automobiles in the amount of $47,103.64 is nondischargeable pursuant to 11 U.S.C. § 523.[1] The parties also stipulate that the only remaining issue the Court must determine under the Complaint is whether Debtor may direct that proceeds collected through a disposition of other collateral be allocated first to the nondischargeable portion of the indebtedness, thereby reducing the amount agreed to be nondischargeable.[2] The parties also agree that there is no need for a further trial or further evidence, and that the Court may render a final decision based on the record developed in this adversary, Debtor's main bankruptcy case, and briefs submitted to the Court. After reviewing

---

[1] Further references to the United States Bankruptcy Code will by section number only.
[2] The Complaint originally sought a determination pursuant to 11 U.S.C. § 727(a)(5). Plaintiff has not pursued the § 727 cause of action and the parties have stipulated that the Court need only address the issue presented herein to resolve the Complaint in its entirety.

the record and the parties' briefs, the Court makes the following Findings of Fact and Conclusions of Law pursuant to pursuant to Fed. R. Civ. P. 52, made applicable to these proceedings through Fed. R. Bank. P. 7052.[3]

## FINDINGS OF FACT

1. AFC is a creditor in Debtor's Chapter 7 proceeding and brings this adversary proceeding to determine the dischargeability of certain indebtedness.

2. The parties agree that the Court has jurisdiction over the matters alleged herein and over this proceeding and also agree that this action is a core proceeding.

3. Debtor was in the business of selling used automobiles in Myrtle Beach, South Carolina under the name of Auto Corral, an unincorporated business.

4. In connection with Auto Corral, on or about December 28, 1999 and again on June 20, 2002, Debtor made, executed and delivered to AFC a Promissory Note ("Note") and Security Agreement ("Security Agreement"). The terms of the Note and Security Agreement provided for AFC to make loans to Debtor for the purchase of automobiles for resale.

5. Section 2.3 of the Note and Security Agreement is entitled "Repayment of Obligations" and provides in relevant part, "The order and method of application of such payments of the Obligations shall be in the discretion of AFC."

6. Contemporaneously with the execution of the Note and Security Agreement, Debtor executed a personal guaranty of performance.

7. To secure obligations due under the terms of the Note, Debtor placed physical possession of the title to the automobiles with AFC and granted AFC a lien and security interest in all

---

[3] The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted

equipment of any kind or nature and all vehicles, vehicle parts and other inventory then owned or thereafter acquired by Debtor ("Encumbered Inventory").[4]

8. AFC filed a UCC-1 Financing Statement with the Secretary of State of South Carolina to perfect its security interest. Debtor does not dispute AFC's perfected security interest in her inventory of automobiles.

9. Pursuant to the Security Agreement, Debtor was required to hold the proceeds from the sale of certain vehicles in trust in a segregated account for the benefit of AFC. After the automobiles were sold and the proceeds paid to AFC, AFC would deliver title to the purchasers.

10. Prior to the bankruptcy filing, Debtor sold the following six automobiles "out-of-trust" by failing to remit the proceeds from the sales to AFC:

| Vehicle | Sales Price |
|---|---|
| 1998 Mazda 626 | $6,905.71 |
| 2000 Durango | $13,295.00 |
| 1999 F-150 | $12,995.00 |
| 2000 Ranger | $8,999.00 |
| 1999 Yukon | $14,185.00 |
| 1999 Mustang | $12,999.00 |

11. Debtor sold these six automobiles (the "Out-of-Trust Vehicles") for a total of $69,378.71.

12. At the time of the sale, Debtor owed $47,103.64 for the Out-of-Trust Vehicles.

13. Debtor agrees that the $47,103.64 debt for the Out-of-Trust Vehicles is non-dischargeable.

---

[4] The parties characterized the Encumbered Inventory as "purchase money inventory" in the "Facts Which Are Admitted" section of their Joint Pre-Trial Order, but make no mention of whether Debtor procured the Encumbered Inventory with an AFC advance or proceeds of an AFC advance and triggered a purchase money security interest in favor of AFC. Nevertheless, the Court need not characterize AFC's security interest in Debtor's Encumbered Inventory since the issue was the subject of a stipulation of the parties.

14. Apparently following the sale of the Out-of-Trust Vehicles, and acting pursuant to its Note and Security Agreement, AFC took possession of several other vehicles on the Auto Corral lot (the "Seized Vehicles").

15. Two of Debtor's automobile suppliers, Rivertowne Autoworld, Inc. ("Rivertowne") and Bobby Allen ("Allen") d/b/a Allen's Used Cars, contacted AFC and claimed ownership of several of the automobiles that AFC seized. There appears to be no dispute that five of the Seized Vehicles were not subject to the claims of Rivertowne and Allen. These five vehicles were not subject to a floor plan agreement Debtor had with AFC but instead served as security for the Note pursuant to AFC's security interest in Encumbered Inventory (hereinafter, the five vehicles will be referred to as the "Non-Floor Plan Vehicles").[5]

16. Rivertowne's and Allen's claims are the subject of an action in Horry County, South Carolina.

17. Debtor filed for bankruptcy protection under Chapter 7 on or about August 28, 2003 and filed the Complaint on January 13, 2004.

18. On February 10, 2004, AFC obtained relief from the automatic stay to sell the Seized Vehicles.

19. On February 24, 2004, AFC sold all of the Seized Vehicles for a total of $150,971.00.

20. AFC sold the Non-Floor Plan Vehicles for a net amount of $23,097.50.

21. AFC applied the proceeds of the sale of the Non-Floor Plan Vehicles to Debtor's account.

---

[5] Factual determinations concerning any issues between AFC and Rivertowne or Allen regarding vehicles possessed by Debtor at the time of AFC's seizure and disposition of collateral are outside the scope of the issues being adjudicated in this proceeding. Therefore, the Court makes no determination whether Rivertowne or Allen have any interest in or right to proceeds produced from AFC's disposition of vehicles which served as collateral for Debtor's obligations to AFC.

22.  When allocating the distribution of the sale proceeds to Debtor's account, AFC applied the proceeds to interest, fees, and payment of debts secured by automobiles other than the Out-of-Trust Vehicles.

23.  As of February 27, 2004, the balance on Debtor's account with AFC after application of those proceeds was $143,784.32.

24.  With respect to amounts collected for the sale of the Seized Vehicles (for which Rivertowne and Allen claim an interest), excluding the Non-Floor Plan Vehicles, AFC placed the proceeds ($127,873.50) in escrow. Application of the full amount held in escrow to Debtor's account with AFC would still leave AFC with a balance due pursuant to the Security Agreement.

25.  The parties have requested that the Court resolve the Complaint by addressing the allocation of payment issue set forth herein.

## CONCLUSIONS OF LAW

Although Debtor agrees that $47,103.64 is nondischargeable, Debtor seeks to have the amount obtained from the sale of the Non-Floor Plan Vehicles, $23,097.50, applied to the nondischargeable amount due. AFC contends that it should not have to credit the $23,097.50 toward the nondischargeable amount, primarily because the Note and Security Agreement provide AFC has the discretion to apply payments of obligations.

No evidence has been presented by Debtor that the elements of a contract are not met, thus serving to negate the application of the allocation language in the Note and Security Agreement. See Wright v. Trask, 329 S.C. 170, 176, 495 S.E.2d 222, 225 (S.C. Ct. App. 1997) (elements of contract are contractual intent, meeting of the minds, and valid mutual consideration). Further, there was no argument that there was any ambiguity with respect to the allocation clause, and the Court sees no reason to deviate from the clear intent of the parties in

executing the Note and Security Agreement. <u>Schulmeyer v. State Farm Fire and Cas. Co.</u>, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (S.C. 2003) (intent of parties to be primarily considered which can be ascertained from language of contract); <u>Ellis v. Taylor</u>, 316 S.C. 245, 449 S.E.2d 487, 488 (1994) (court is to enforce unambiguous contract according to its terms regardless of unreasonableless or a parties' failure to guard their rights). Therefore, according to the express agreement of the parties, AFC may direct the application of the proceeds to debt other than the nondischargeable debt.

Even if the Court were to look beyond the language of the Note and Security Agreement, determining whether the proceeds from the sale of the Non-Floor Plan Vehicles should be allocated toward the nondischargeable amount turns on whether the repossession and sale of those vehicles are the equivalent of a "voluntary payment."

The general rule governing allocation of payments is that the party paying may direct to what the application is to be made. <u>Nat'l Bank v. Mechanics' Nat'l Bank</u>, 94 U.S. 437, 439 (1876). If no direction is given, the creditor may apply the payment as it wishes. The general rule regarding allocation of payments is a matter of common law and is consistent with South Carolina authority. Restatement (Second) of Contracts § 258 (2003); <u>Frost & Co. v. Weathersbee</u>, 1885 WL 3667 (Nov. 28, 1885) (debtor, when owing two debts to same creditor, has the right on making payment to direct its application). See also <u>Maryland Cas. Co. v. South Norfolk</u>, 54 F.2d 1032, 1038 (4th Cir. 1932) (reciting general rule that right to direct application belongs in the first instance to the debtor). The United States District Court for the District of South Carolina further described the general rule as follows:

> [T]he general rule for the application of payment when there are a number of accounts due the creditor by the debtor [is that,] [o]rdinarily, a creditor must apply the payments as instructed by the debtor; absent instructions from the debtor, the creditor may apply them as he chooses, between

6

secured and unsecured matured debts, including past-due account; and, if neither creditor nor debtor allocates, the Court will apply the payments as justice requires, generally to the advantage of the creditor in the absence of supervening equities.

American Oil Co. v. Brown Paving Co., 298 F. Supp. 528, 534 (1969) (payments made on accounts by debtor). See also Maddux Supply Co. v. Safhi, Inc., 316 S.C. 404, 408, 450 S.E.2d 101, 103 (S.C. Ct. App. 1994) ("Ordinarily, a creditor must apply payments as instructed by the debtor.").[6]

However, where the payment is *involuntary*, the general rule concerning allocation of payments by a debtor is inapplicable. Gerwer v. Salzman (In re Gerwer), 253 B.R. 66, 70 (B.A.P. 9th Cir. 2000). See also Restatement (Second) of Contracts 10, Introductory Note (2003) (rules set forth concerning application of payments does not extend to payments that are rendered involuntary).

In Gerwer, the Ninth Circuit Bankruptcy Appellate Panel cited United States Supreme Court and bankruptcy authority illustrating the voluntary payment allocation rule. The court further cited state law providing that where a debtor "does an act", the debtor can apply the performance as requested and noted that applicable state law was consistent with the general rule. The court found that a payment made by a Chapter 7 trustee to the dischargeable, rather than nondischargeable, portion of a debt was an involuntary payment that could not be directed by debtor. Gerwer, 253 B.R. at 70 (citing cases). The Court noted that "voluntary payments made from a debtor must be applied as debtor directs. That rule does not apply to involuntary payments, however, which may be applied as the creditor wishes." (citing Baxter State Bank v.

---

[6] While South Carolina case law does not specifically reference a "voluntary" payment, the theory that a debtor, *on making a payment* can direct its application, is consistent with the general common law rule concerning voluntary payments and the phrase "making a payment" implies its voluntary nature. See Weathersbee, 1885 WL 3667.

7

Bernhardt, 985 F. Supp. 1259, 1269 (D. Kan. 1997). See also In re Custer, 88 B.R. 573, 575-76 (Bankr. D. Conn. 1988) ("debtor making a voluntary payment has the absolute right to have that payment allocated among various obligations in accordance with his or her instructions.").[7]

BLACK'S LAW DICTIONARY defines a voluntary payment as "A payment made by a debtor of his own will and choice, as distinguished from one exacted from him by process of execution or other form of compulsion." BLACK'S LAW DICTIONARY 1017 (5th ed. 1979). Cf. In re F.A. Dellastatious, Inc., 121 B.R. 487, 491 (Bankr. E.D. Va. 1990)(noting that the United States Tax Court defined involuntary payment of Federal taxes as "any payment received by agents of the United States as a result of distraint or levy or from legal proceeding . . ."). In this case, AFC's resort to repossession and sale proceedings cannot be considered voluntary because AFC utilized legal remedies in order to realize an amount of money to be applied toward Debtor's payment obligations. Furthermore, Debtor neither argued nor asserted that the proceeds generated amounted to a "voluntary payment," and there is nothing in the Note or Security Agreement that provides Debtor with authority to dictate the application of proceeds produced from AFC's sale of collateral in light of Debtor's default. Therefore, in light of the involuntary nature of the repossession and sale, as well as the agreement between the parties, Debtor is without any authority to dictate the application of the proceeds generated by the sale of the Non-Floor Plan

---

[7] An exception to the general rule concerning voluntary payments was expressed by the United States Supreme Court in United States v. Energy Resources, Co., 495 U.S. 545 (1990). In Energy Resources, the Court found that even if tax payments under a plan of reorganization are involuntary, the bankruptcy court could direct the allocation of payments to the IRS if such allocation was necessary to the success of the reorganization plan. Id. at 549. See also In re M.C. Tooling Consultants, Inc., 165 B.R. 590, 592 (Bankr. D.S.C. 1993) (payments under Chapter 11 plan were not voluntary; court considered whether allocation of tax payment was necessary to an effective reorganization.). The exception is inapplicable here as courts have generally not applied Energy Resources in the context of a Chapter 7 case. United States v. Pepperman, 976 F.2d 123, 129-139 (3d Cir. 1992).

Vehicles; AFC has discretion to dictate the application of the proceeds. See Gerwer, 253 B.R. at 72.[8]

To the extent Debtor argues that the Court should allocate proceeds in this case based on equitable considerations, this Court notes that issues regarding allocation of payments can best be determined by legal principles as set forth herein. Gerwer, 252 B.R. at 72. But see Peterson v. Bozzano (In re Bozzano), 183 B.R. 735, 739 (Bankr. M.D.N.C. 1995) (apportioning payment pro rata between dischargeable and nondischargeable debts; did not address voluntary or involuntary nature of payment) (citing Jennen v. Hunter (In re Hunter), 771 F.2d 1126, 1130 (8th Cir. 1985). See also United States v. Energy Resources Co., 495 U.S. 545 (1990) (in context of Chapter 11 case, bankruptcy court's authority to order certain application of taxes was consistent with § 105 and the court's authority to modify creditor-debtor relationships). However, if the Court were to weigh the equities in this case, the actions of Debtor do not warrant the imposition of equity in her favor. The overall goal of the Bankruptcy Code is to provide a fresh start to an honest but unfortunate debtor. Grogan v. Garner, 498 U.S. 279, 287 (1991); Castles v. Bailey (In re Bailey), Nos. 99-05056-W, 99-80333-W, 2000 WL 33710881 at *2 (Bankr. D.S.C. March 13, 2000). By admitting that she sold vehicles out of trust, Debtor establishes that she comes before the Court with unclean hands. Therefore, Debtor is in no position to be afforded any equitable remedies that this Court may grant an honest debtor seeking a fresh start. See In re Strange, C/A No. 03-00229, slip op. at 7 (Bankr. D.S.C. Jun. 13, 2003)(noting in the context of setoff that no

---

[8] In a post-hearing brief, Debtor summarily argues that AFC has applied, or is attempting to apply, the $23,097.50 toward a debt that has already been discharged. Debtor did not produce evidence demonstrating that AFC's lien was subject to discharge or evidence indicating that AFC's lien has been avoided in Debtor's bankruptcy case. Therefore, AFC's lien passes through Debtor's bankruptcy, and remains subject to foreclosure following Debtor's discharge as an *in rem* action against the collateral. Dewsnup v. Timm, 502 U.S. 410, 417 (1992)("we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected . . . We think, however, that the creditor's lien stays with the real property until the foreclosure."). Accord Ducker v. Standard Supply Co., 280 S.C. 157, 159, 311 S.E.2d 728, 730 (1984)("A discharge of the personal liability of a debt or judgment does not affect the lien securing that debt or judgment.").

9

compelling facts or circumstances convinced the Court to exercise its 11 U.S.C. § 105(a) powers to allocate payments as requested by debtor). Equitable considerations do not compel the Court the exercise its authority under 11 U.S.C. § 105(a) and order AFC to credit the proceeds from selling the Non-Floor Plan Vehicles to Debtor's nondischargeable debts.[9] Therefore, it is

ORDERED, that based on the facts of this case, AFC has the discretion to dictate the application of proceeds collected from the sale of the Non-Floor Plan Vehicles; and it is further

ORDERED that the indebtedness in the amount of $47,103.64 is nondischargeable.

*John E. Waites*
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
May 7, 2004

---

[9] AFC relies, in addition to the language of the Note and Security Agreement, on a recent Fourth Circuit case as authority for the proposition that AFC may apply the payments it received to dischargeable obligations. Kielisch v. Educational Credit Mgmt. Corp. (In re Kielisch), 258 F.3d 315 (2002). However, this case does not appear to be directly applicable in that the Fourth Circuit, in a Chapter 13 case, relied upon the fact that student loans pass unaffected through the bankruptcy estate (absent a finding of undue hardship) and that Congress has specifically addressed the manner in which a creditor must apply payment from a student loan debtor. Id. at 320-21 (also finding that § 502 did not provide a basis to hold otherwise).